UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT L. DAVIS,

    Petitioner,

v.                                          Case No. 8:21-cv-1517-CEH-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

    Respondent.
_____/

**ORDER**

Robert L. Davis, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent filed a response opposing the petition. (Doc. 8) Davis filed a reply. (Doc. 18.) Upon consideration, the petition will be **DENIED**.

**I.**     **Background**

This case arises from Davis's burglary of West Florida Supply Company, a cleaning supply business in Sarasota, Florida. (Doc. 9-3, Ex. 1a, at 115-16.) On a Monday morning in June 2018, Diane Schiessle, the president and owner of the business, arrived at work. (*Id.* at 118.) An employee standing outside the building "yelled to [her] that the window was broken into." (*Id.*) Schiessle went inside and observed dried blood "all over the counter" by the broken window. (*Id.*) She called 911 and did "a walk-through with law enforcement to assess the damage." (*Id.* at 119).

1

During the walk-through, Schiessle noticed that several items were missing—specifically, two cell phones, a projector, a radio, and a printer. (*Id.*) Outside the building, police discovered that the business's phone and cable lines had been cut. (*Id.* at 153-54, 157.)

Law enforcement collected a sample of the blood on the counter and ultimately ran it through CODIS, a DNA database. (*Id.* at 307.) The blood sample matched a profile belonging to Davis. (*Id.* at 307-08.) Police interviewed Davis and asked him why his "blood was inside of West Florida Supply Company." (*Id.* at 211.) Davis responded that "there was a possibility that he visited the building and he bleeds easily." (*Id.*) Law enforcement obtained a buccal swab from Davis and compared it to the DNA sample from the blood on the counter. (*Id.* at 211-13, 281-82.) The swab matched the sample. (*Id.* at 282.) According to the technician who conducted the test, "the observed DNA profile [was] greater than 700 billion times more likely to occur if it originated from Robert Davis than if it originated from an unrelated unknown individual." (*Id.* at 294.)

Davis was charged with burglary of an unoccupied structure. (Doc. 9-2, Ex. 1, at 32.) Shortly thereafter, he moved to terminate his public defender and proceed *pro se*. (*Id.* at 58-59.) The court conducted a *Faretta*[1] inquiry, determined that Davis "was competent to waive counsel and that [his] waiver was both knowing and intelligent," and allowed him to represent himself. (*Id.* at 58.) Following a jury trial, Davis was

---

[1] *Faretta v. California*, 422 U.S. 806 (1975).

convicted of burglary of an unoccupied structure. (*Id.* at 303.) After finding that Davis qualified as a habitual felony offender, the state trial court sentenced him to five years' imprisonment. (*Id.* at 624.) The state appellate court *per curiam* affirmed the conviction and sentence. (Doc. 9-3, Ex. 5.) This federal habeas petition followed. (Doc. 1.)

## II.   Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme]

3

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Davis's conviction and sentence without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### III. Discussion

#### A. Ground One

Davis argues that the application of Florida's DNA database statute to him violated the ex post facto clause of the federal constitution. (Doc. 1 at 5, 9.) The DNA database statute, codified at Fla. Stat. § 943.325, "requires any person convicted of certain enumerated offenses to submit to DNA testing." *M.S. v. State*, 987 So. 2d 774, 777 (Fla. 4th DCA 2008). Davis alleges that he was convicted of burglary in 1998. (Doc. 1 at 5.) At the time, Florida law did not require persons convicted of burglary to submit blood specimens for inclusion in the statewide DNA database. *See* Fla. Stat. § 943.325(1)(a) (listing offenses for which submission of a "specimen[] of blood" is required) (1998). In July 2000, the DNA database statute was amended to require prisoners "previously convicted" of burglary to submit blood samples for DNA analysis. Fla. Stat. § 943.325(1)(a) (2000). In March 2001, Davis was serving a prison sentence for "uttering a forged instrument," which was not a qualifying offense under the DNA database statute. (Doc. 20 at 5.) Based on his 1998 conviction for burglary, however, correctional officials obtained a sample of Davis's blood and entered it into CODIS. (*Id.*) Years later, law enforcement identified Davis as a suspect in the burglary of West Florida Supply Company based on a match between his CODIS profile and the blood from the scene.

Davis argues that his compelled submission of a DNA sample in March 2001 violated the ex post facto clause because, at the time of his 1998 burglary conviction, the DNA database statute did not apply to him. (*Id.* at 9.) Thus, according to Davis,

5

he pled guilty to burglary in 1998 without any "notice" that his conviction would one day allow the State to obtain a blood specimen from him. (*Id.*) The state trial court rejected Davis's ex post facto argument, holding that all "three [of his] challenges to the admission of the DNA analysis" were "without legal merit."[2] (Doc. 9-2, Ex. 1, at 99.) The trial court did not elaborate on its reasoning for rejecting the ex post facto challenge. (*Id.*) Following his conviction, Davis raised the issue on direct appeal, (Doc. 9-3, Ex. 2, at 10-20), and the state appellate court affirmed without a written opinion, (Doc. 9-3, Ex. 5).

Because the state court rejected the ex post facto claim without providing an explanation, Davis must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. He cannot meet this burden.

The ex post facto clause bars the enactment of "any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981). In other words, the clause prohibits "retroactive punishment." *Smith v. Doe*, 538 U.S. 84, 92 (2003). An "ex post facto inquiry . . . [focuses] not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995).

---

[2] Davis also argued that the admission of the DNA evidence violated his Fourth Amendment rights and his right to due process. (Doc. 9-2, Ex. 1, at 71-84.)

In addition, "the ex post facto bar applies only to criminal laws, not to civil regulatory regimes." *United States v. W.B.H.*, 664 F.3d 848, 852 (11th Cir. 2011) (citing *Kansas v. Hendricks*, 521 U.S. 346, 369 (1997)).

The state court reasonably concluded that Davis's ex post facto argument lacked merit. In *Morrow v. State*, Florida's Fourth District Court of Appeal rejected a similar ex post facto challenge to the DNA database statute. 914 So. 2d 1085, 1085 (Fla. 4th DCA 2005). There, the Department of Corrections sought to "compel [the] defendant to provide blood and saliva samples for DNA testing" based on a thirteen-year-old conviction for "false imprisonment with a deadly weapon." *Id.* The defendant argued that "the retroactive application of the statute violate[d] the ex post facto clause because he was without notice that he would be subject to this kind of provision in the future." *Id.* The court rejected this argument, holding that "the application of the statute" in these circumstances was "not an ex post facto violation." *Id.* at 1086. The court explained that "[a]lthough [§] 943.325 is retrospective in its effect, it does not alter the elements of [the defendant's] criminal conduct or increase the penalty for his crime." *Id.*

*Morrow* is not an outlier. To the contrary, "[c]ourts of other jurisdictions that have addressed this issue have all arrived at the same conclusion, namely that statutes requiring convicts to submit DNA samples do not contravene the ex post facto clause, even when the underlying convictions precede the DNA collection statutes." *State v. Banks*, 146 A.3d 1, 14-15 (Conn. 2016) (collecting cases); *see also, e.g.*, *In re DNA Ex Post*

*Facto Issues*, 561 F.3d 294, 299 (4th Cir. 2009) (finding that South Carolina's "DNA-sample requirement" does "not violate the Ex Post Facto Clause" because it is "not penal in nature"); *Shaffer v. Saffle*, 148 F.3d 1180, 1182 (10th Cir. 1998) (holding that Oklahoma's DNA database statute "do[es] not run afoul of the Ex Post Facto Clause" because it has "a legitimate, non-penal legislative purpose"); *Gilbert v. Peters*, 55 F.3d 237, 238-39 (7th Cir. 1995) ("Both federal and state courts have uniformly concluded that statutes which authorize collection of blood specimens to assist in law enforcement are not penal in nature."). These courts reason that DNA database statutes are designed "not to punish the individuals submitting the samples[,] but rather to establish a data bank that will aid future law enforcement and other agencies in identifying individuals." *State v. Bain*, No. 2008-286, 2009 WL 170109, at *1 (Vt. Jan. 14, 2009).

The same is true of Florida's DNA database statute. *See* Fla. Stat. § 943.325(1)(a) (stating that "it is in the best interests of the citizens of this state to establish a statewide DNA database" in order to "assist federal, state, and local criminal justice and law enforcement agencies in the identification and detection of individuals in criminal investigations and the identification and location of missing and unidentified persons"). Moreover, while "requiring the submission of DNA samples may be viewed as disadvantageous or burdensome, application of the DNA database statute to persons based on conduct that preceded enactment of the statute does not violate the ex post facto clause because the statute neither alters the definition of, nor increases the punishment for, a crime." *Bain*, 2009 WL 170109, at *1.

For these reasons, the state court reasonably concluded that the application of the DNA database statute to Davis did not violate the ex post facto clause. Accordingly, Ground One is denied.

**B.     Ground Two**

Davis contends that the trial court violated his right to "a fair trial" by preventing him from "adequately question[ing] the jury" during *voir dire* "about their feelings" concerning "defendants who cho[o]se to represent themselves." (Doc. 1 at 7, 9.) Before *voir dire*, the court informed prospective jurors that Davis did "not have an attorney with him." (Doc. 9-3, Ex. 1a, at 26.) The court explained that Davis had "the right to be represented by an attorney or to represent himself in this trial, as do all criminal defendants in this country." (*Id.*) The court then stated that Davis had "specifically exercised his constitutional right to act as his own attorney," and that "[t]his decision should not affect your consideration of this case in any manner whatsoever." (*Id.* at 26-27.)

During *voir dire*, a prospective juror asked the court whether Davis had "waived his right to an attorney." (*Id.* at 44.) The court answered that he had. (*Id.*) The prospective juror then inquired whether Davis had been "informed that he has a right to have an attorney." (*Id.* at 44-45.) The court responded:

> Absolutely. And he chose, which is his absolute right, he was afforded court-appointed counsel and he chose to not avail himself of that, which is totally his right, and he has decided to represent himself. I had several discussions with him and he voluntarily waived his right to an attorney, and the jury cannot be influenced in any way by that decision on his part and it's his absolute right to do that. Do you think that would have any effect on your ability to be a fair juror in this case? And just so you know,

9

> in these situations, and I want to stress over and over again, that is his absolute right, he will be bound by the same rules and requirements and he's aware of that. But again, that's his absolute right and the jury cannot be influenced in any negative way about that. Are you comfortable with that?

(*Id.* at 45.) The prospective juror said, "Yes, as long as he's been fully informed." (*Id.*)

Davis's decision to represent himself did not come up again until he began to question prospective jurors. At that point, Davis attempted to explain to the jury pool why he had chosen to proceed *pro se*:

> MR. DAVIS: One of the reasons I'm representing myself is because I did have an attorney at one time, the public defender. I don't have any money to hire a lawyer, and my experience with the public defender was not good. I was very scared. And evaluating the circumstances, I found out since I do have a little bit of education and I have a little confidence because—
>
> [THE STATE]: Objection.
>
> MR. DAVIS: What ground?
>
> THE COURT: What's the legal basis?
>
> [THE STATE]: Argumentative to the jury.
>
> THE COURT: I'll sustain the objection.
>
> MR. DAVIS: Again, one of the reasons why I represent myself was my bad experiences with the Public Defender's Office—
>
> [THE STATE]: Objection, same grounds.
>
> THE COURT: Mr. Davis, the panel has been told you do have the absolute right to represent yourself. You made that decision. I think that's as far as we'll proceed with that.
>
> MR. DAVIS: Your Honor, it doesn't have anything to do with the case and—

10

>THE COURT: It's an issue of relevance, so I sustained the objection. So please proceed.

(*Id.* at 73-74.)

In his federal habeas petition, Davis argues that the trial court barred him from "lay[ing] the foundation relating to [his] decision of self-representation." (Doc. 1 at 9.) This allegedly made it impossible for Davis to "adequately question" prospective jurors about their "feelings" regarding *pro se* defendants. (*Id.*) Respondent maintains that Ground Two is unexhausted and procedurally defaulted. (Doc. 8 at 25-26.) The Court need not reach that issue because, even under *de novo* review, Davis's claim fails on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

The federal constitution "guarantees both criminal and civil litigants a right to an impartial jury," and "voir dire can be an essential means of protecting this right." *Warger v. Shauers*, 574 U.S. 40, 50 (2014). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992). Thus, "[a]lthough the conduct of voir dire is largely left to the sound discretion of the trial court, the [] court's voir dire must at least provide reasonable assurance that prejudice will be discovered if present." *United States v. Hill*, 643 F.3d 807, 836 (11th Cir. 2011). In other words, the court must allow sufficient inquiry "to ascertain whether the juror has any bias, opinion, or prejudice

that would affect or control the fair determination by him of the issues to be tried." *Mu'Min v. Virginia*, 500 U.S. 415, 422 (1991).

The trial court did not improperly limit Davis's *voir dire* examination. Before *voir dire*, the court told prospective jurors that Davis had "specifically exercised his constitutional right to act as his own attorney," and that "[t]his decision should not affect your consideration of this case in any manner whatsoever." (Doc. 9-3, Ex. 1a, at 26-27.) During *voir dire*, one of the prospective jurors asked whether Davis had been "informed" of his right to an attorney. (*Id.* at 44-45.) The court answered in the affirmative and reiterated that (1) Davis had "voluntarily waived his right to an attorney" and "decided to represent himself," and (2) "the jury cannot be influenced in any way by that decision on his part." (*Id.* at 45.) The court then confirmed that the prospective juror was "comfortable" with Davis's decision to represent himself. (*Id.*) No other member of the jury pool indicated any potential bias against Davis based on his choice to proceed *pro se*. Taken as a whole, then, the *voir dire* inquiry on Davis's decision to represent himself "gave reasonable assurance to the parties that any prejudice of the potential jurors would be discovered." *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990).

Davis complains that the court did not allow him to tell prospective jurors why he chose to represent himself. (Doc. 1 at 9.) But he fails to explain why an account of that decision was necessary "to ascertain whether [the prospective] juror[s] ha[d] any bias, opinion, or prejudice that would affect or control the fair determination by [them] of the issues to be tried." *Mu'Min*, 500 U.S. at 422. As noted above, the court informed

12

the jury pool that Davis had chosen to exercise his right to represent himself, and that his decision to proceed *pro se* should not influence the jury in any way. Davis was free to ask prospective jurors whether, in light of his *pro se* status, they could fairly and impartially decide the case. In these circumstances, there is no basis to conclude that Davis's inability to explain his decision to represent himself prevented him from detecting "prospective jurors who [would] not be able impartially to follow the court's instructions and evaluate the evidence." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Accordingly, the court acted well within its "broad discretion to manage jury selection" when it barred Davis from telling prospective jurors why he chose to proceed *pro se*. *United States v. Tsarnaev*, 595 U.S. 302, 316 (2022).

Ground Two is denied.[3]

### C.     Ground Three

Davis contends that the trial court denied him "a fair trial" by refusing to give the jury a special instruction about their "right to hold on to a verdict belief that is different than other jurors['], as long as that belie[f] is one that is beyond a reasonable doubt." (Doc. 1 at 8-9.) In accordance with Florida's standard instructions, the court informed the jury that (1) "[w]hatever verdict you render must be unanimous, that is,

---

[3] Davis claims that the trial court "tainted the jury panel by accusing [him] of making a reckless decision to exercise his constitutional right to represent himself." (Doc. 1 at 7.) That is incorrect. The court never referred to Davis's decision to proceed *pro se* as "reckless," nor did it make any statements to the jury pool that could be construed as disparaging that decision. Davis also alleges that the trial court highlighted his racial background by asking prospective jurors whether "anything about the nature of the charge itself" suggested that they could not "be completely fair and objective." (Doc. 18 at 8.) This question plainly does not refer to Davis's race, and the court did not otherwise refer to his racial background during the trial.

each juror must agree to the same verdict," and (2) the "verdict must be unanimous, that is, all of you must agree to the same verdict." (Doc. 9-2, Ex. 1, at 297, 299.) During the charge conference, Davis had requested that the court also read a special instruction stating that "every juror has a right to stay with what they believe in." (Doc. 9-3, Ex. 1a, at 235.) Specifically, he asked the court to instruct the jury as follows: "A unanimous v[e]rdict that is required for a guilty or not guilty verdict, does not terminate a juror's choice to hold to a verdict that is different to other jurors as long as the verdict is based on a belief beyond a reasonable doubt." (Doc. 9-2, Ex. 1, at 304.)

The court declined to read the special instruction. It explained that (1) the standard instruction "accurately states the law that the verdict that is eventually rendered must be unanimous"; (2) "[i]f there is not a unanimous verdict, the jury would let me know, and then we could go into the deadlock instruction, if deemed necessary"[4]; and (3) Davis would be free to maintain during closing argument that "individual jurors" should "stick to their guns." (Doc. 9-3, Ex. 1a, at 348.) Davis subsequently challenged the denial of his special instruction on direct appeal, arguing that the jury should have been informed of their "right to . . . maintain a verdict that mi[ght] be different from other jury members." (*Id.*, Ex. 2, at 25-35.) As noted above, the state appellate court affirmed Davis's conviction and sentence without a written opinion. (*Id.*, Ex. 5.)

---

[4] Florida's standard "deadlock instruction" states, among other things, that "[w]e are all aware that it is legally permissible for a jury to disagree." Fla. Std. Jury Instr. (Crim.) 4.1.

14

In his federal habeas petition, Davis argues that the standard instructions on juror unanimity "misle[d] the jury to believe they have to abandon their [] belie[fs] to satisfy a unanimous decision." (Doc. 1 at 8.) As a result, Davis contends, the trial court's refusal to read his "curative instruction" deprived him of his right to a "fair trial." (*Id.* at 8-9.)

The state court reasonably rejected Davis's jury-instruction claim.[5] "State court jury instructions ordinarily comprise issues of state law and are not subject to federal habeas corpus review absent fundamental unfairness." *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986). To establish fundamental unfairness, Davis must demonstrate that "the [alleged] error so infected the entire trial that the resulting conviction violates due process." *Jacobs v. Singletary*, 952 F.2d 1282, 1290 (11th Cir. 1992). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In such cases, the burden on the petitioner is "especially heavy." *Id.*

Davis cannot meet his burden. At the outset, the trial court's instructions on juror unanimity correctly stated the law. "As a state constitutional matter, a criminal conviction requires a unanimous verdict in Florida." *Robinson v. State*, 881 So. 2d 29, 30 (Fla. 1st DCA 2004). Likewise, "the Supreme Court has confirmed that the

---

[5] Respondent argues that Ground Three is unexhausted because Davis failed to alert the trial court to the federal nature of his claim. (Doc. 8 at 31.) This argument lacks merit. Davis argued before the trial court that the jury needed to be told that "they still have the right, a Constitutional right, to hold onto a verdict that is not unanimous." (Doc. 9-3, Ex. 1a, at 347.) He then suggested that his proposed instruction followed from "what the United States and the Florida Supreme Court has mandated." (*Id.*) Thus, Davis made "the state court aware that [his claim raised] federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007).

15

[Federal] Constitution requires a jury to reach a unanimous guilty verdict to convict." *United States v. Brown*, 996 F.3d 1171, 1183 (11th Cir. 2021) (citing *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020)). "Because the instructions [on the requirement of juror unanimity] fairly and correctly stated the law, they did not violate due process." *Jamerson v. Sec'y for Dep't of Corr.*, 410 F.3d 682, 690 (11th Cir. 2005) (citation omitted).

Davis likewise fails to establish that he is entitled to relief based on the court's refusal to give his special instruction. Davis appears to contend that, because the jurors in his case were not told they could "stick to their guns," they were coerced to "abandon their [] belie[fs] to satisfy a unanimous decision." (Doc. 1 at 8.) A defendant "being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). But "[c]oercion does not mean simple pressure to agree." *Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019). "Pressure becomes coercive when the actions of the court result in 'a minority of the jurors . . . sacrific[ing] their conscientious scruples for the sake of reaching agreement.'" *Id.* (quoting *Green v. United States*, 309 F.2d 852, 854 (5th Cir. 1962)). Simply put, the court "must not coerce any juror to give up an honest belief." *United States v. Davis*, 779 F.3d 1305, 1312 (11th Cir. 2015).

The failure to give Davis's proposed instruction did not "coerce any juror to give up an honest belief." *Id.* "Absent some evidence of coercion or confusion," the jury need not be "specifically informed" that "a 'hung jury' is an acceptable outcome where unanimity cannot be reached." *United States v. Wilson*, 257 F. App'x 547, 549

16

(3d Cir. 2007); *see also* 75A Am. Jur. 2d Trial § 1148 (2024) (noting that a court "may advise the jury that each member must decide the case for oneself and not abandon an honest opinion for a unanimous verdict, but such a specific instruction is not necessary, and a defendant is not entitled to an instruction that a juror may abstain or not agree"). Indeed, "[t]he mere absence of such an instruction does not in and of itself suggest coercion." *United States v. Price*, 13 F.3d 711, 725 (3d Cir. 1994). Here, there is no evidence that the jury was deadlocked, and "nothing to suggest that any juror would believe it was necessary to compromise his/her view of the evidence to allow the jury to return a unanimous verdict." *Wilson*, 257 F. App'x at 549. In short, the court correctly informed the jury that "[t]he verdict must be unanimous," but it "did not suggest, imply, or pressure the jury to return a particular verdict." *Crawford v. Sec'y, Fla. Dep't of Corr.*, No. 3:14-cv-847-BJD-PDB, 2017 WL 1135006, at *13 (M.D. Fla. Mar. 27, 2017). In these circumstances, the mere refusal to give Davis's proposed instruction did not coerce the jury into reaching a verdict. Thus, Ground Three is denied.

### D. Ground Four

Finally, Davis asks this Court to "terminate [] AEDPA review" on his petition because the statute "is [an] unconstitutional act." (Doc. 1 at 11.) According to Davis, AEDPA violates the constitution in two ways: first, it leads to criminal defense attorneys "no longer [being] professionally held accountable for incompetent action and/or inaction"; and second, it "prevents the district court from granting [] relief[] if

17

the U.S. Supreme Court hasn't entered a favorable ruling under similar circumstances." (*Id.*)

These arguments lack merit. First, even if AEDPA did not apply and Davis's claims were subject to *de novo* review, they would still fail on the merits for the reasons discussed above. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.").

Second, courts have uniformly rejected similar challenges to AEDPA's constitutionality, and Davis offers no basis to depart from those decisions. *See, e.g.*, *Cobb v. Thaler*, 682 F.3d 364, 374 (5th Cir. 2012) ("Four circuits have addressed constitutional challenges to AEDPA similar to [petitioner's], and each has rejected that challenge." (collecting cases)); *Evans v. Thompson*, 518 F.3d 1, 3 (1st Cir. 2008) (noting that "constitutional challenges to the AEDPA amendments have been rejected by majority opinions in the Fourth, Seventh, and Ninth Circuits"); *Garey v. United States*, No. 5:03-cr-83-CDL, 2013 WL 6036692, at *3 (M.D. Ga. Nov. 13, 2013) ("AEDPA has been found constitutional and [petitioner's] claim [to the contrary] is without merit.").

For these reasons, Ground Four is denied.

It is therefore **ORDERED** that Davis's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Davis and to **CLOSE** this case.

### Certificate of Appealability
### and Leave to Appeal *In Forma Pauperis* Denied

It is further **ORDERED** that Davis is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a certificate of appealability must first issue. *Id*. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To obtain a certificate of appealability, Davis must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Davis has not made the requisite showing. Finally, because Davis is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida, on April 22, 2024.

*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge